# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### COLUMBIA DIVISION

DR. JOYCE BROWN,                                )
                                                )
     **Plaintiff,**                             )
                                                )        **Case No. 3:11-cv-0980**
**v.**                                          )        **Judge Aleta A. Trauger**
                                                )
**CVS PHARMACY, L.L.C., K MART**                )
**CORPORATION, WALGREEN CO.,**                  )
**WAL-MART STORES EAST, L.P.,**                 )
                                                )
     **Defendants.**                            )

## MEMORANDUM

Pending before the court are motions for summary judgment filed by defendants Walgreen Co. ("Walgreens") (Docket No. 41), Wal-Mart Stores East, L.P. ("Wal-Mart") (Docket No. 43), K-Mart Corporation (Docket No. 44), and Tennessee CVS Pharmacy, L.L.C. ("CVS") (Docket No. 46), to which the plaintiff, Dr. Joyce Brown, has filed Responses in opposition (Docket Nos. 53 (Walgreens), 55 (Wal-Mart), 54 (K-Mart), and 56 (CVS)).[1] For the reasons stated herein, the motions will be granted and the plaintiff's claims will be dismissed with prejudice.

## BACKGROUND[2]

---

[1] In their motions, the defendants have incorporated their respective arguments by reference. Dr. Brown's Responses are tailored in certain respects to each particular defendant, but otherwise assert substantially the same counter-arguments. No defendant filed a reply brief.

[2] Aside from citations to publicly available legal authorities, the record contains no factual evidence other than (1) Dr. Brown's six-paragraph affidavit (Docket No. 52, Ex. 3); (2) excerpts from Dr. Brown's deposition, and (3) short affidavits from several of Dr. Brown's patients. Notably, the record contains no depositions of or testimony from any defendant or any current or former employee thereof, nor does it contain any documentary evidence such as emails or other

1

# I.    Dr. Brown and the DEA Investigation at Issue

Dr. Joyce Brown is the sole proprietor of a medical practice known as the "Professional Medical Group."  Dr. Brown's practice predominantly consists of "occupational medicine and, in particular, medical pain relief for the dedicated worker."  (Brown Dep. at 29:9-12.)  She prescribes multiple types of narcotic pain medication to all of her patients.  (*Id.* at 33:9-24.) These narcotics are "opioids," including Lortab, Percoset, Endocet, Oxycodone, Tramadol, and Opana.  (*Id.* at 149:14-16.)[3]  Her patients generally pay out of pocket for her services.

Although it does not appear that Dr. Brown was ever charged with criminal conduct or

---

correspondence.  Although Dr. Brown responded to each defendant's Statement of Undisputed Material Facts (*see* Docket No. 53, Ex. 4; Docket No. 54, Ex. 2; Docket No. 55, Ex. 2; and Docket No. 56), Dr. Brown did not file a separate statement of additional materials facts pursuant to Local Rule 56.01(c).  Accordingly, the court must rule on the limited record before it, taking into consideration Dr. Brown's objections to the defendant's asserted facts.  Unless otherwise noted, the facts stated in this section are drawn from the materials presented by the parties, drawing all reasonable inferences in favor of Dr. Brown.  *See also* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.")

[3]According to the Attorney's Medical Advisor, opioids "are synthetic versions of opium that are used to treat moderate and severe pain."  5 Attorneys Medical Advisor § 40:56, MedAdv. § 40:46 (updated Aug. 2013).  The Physicians' Desk Reference cautions that "all patients treated with opioids require careful monitoring for signs of abuse and addiction, because use of opioid analgesic products carries the risk of addiction even under appropriate medical use."  2011 PDR 2620-0600 (updated Aug. 2011) (relating to Opana).  The PDR warns, for example, that drugs containing oxycodone, such as Percocet, "are sought by drug abusers and people with addiction disorders and are subject to criminal diversion" and "can be abused in a manner . . . legal or illicit."  2011 PDR 2620-0690 (updated Aug. 2011) (relating to Percocet). Therefore, "[t]his should be considered when prescribing or dispensing Percocet tablets in situations where the physician or pharmacist is concerned about an increased risk of misuse, abuse, or diversion."  *Id*; *see also* 2011 PDR 2620-0600 (listing "WARNING" for Opana, stating that Opana is a "Schedule II controlled substance, with an abuse liability similar to other opioid analgesics," and that it "can be abused in a manner similar to other opioid agonists, legal or illicit.  This should be considered when prescribing or dispensing Opana [] in situations where the physician or pharmacist is concerned about an increased risk of misuse, abuse, or diversion.").

the subject of professional discipline, her medical practice was the subject of an investigation (or investigations) by the Town of Smyrna Police Department and the Drug Enforcement Agency as of early 2009, if not before.[4]  By February 2009 (and perhaps earlier), Dr. Brown began receiving reports from her patients that certain pharmacies were not filling prescriptions written by her.  On August 9, 2009, the DEA raided Dr. Brown's clinic and confiscated patient charts and other records.  Officers from the Smyrna Police Department were present during the raid.  The record contains no indication that any governmental entity ultimately charged Dr. Brown with a crime.

On October 9, 2009, Dr. Brown filed a lawsuit against four Smyrna police officers (the *Nabours* lawsuit), alleging claims related to (1) the investigation by the Smyrna Police Department into her prescribing practices; and (2) a minor traffic accident that occurred in February 2009.  (*Nabours* Compl.; *see also Nabours*, 2011 WL 2443882, at *1.)[5]  On August 4,

_____

[4]Although the date on which the investigation began is not clear from the record in this case, the court takes judicial notice of Dr. Brown's Complaint in a previous lawsuit, *Brown v. Nabours, et al.*, No. 3:09-cv-0927 (M.D. Tenn. filed Oct. 2, 2009) [hereinafter, "*Nabours*"] (*Nabours* Docket No. 1, Compl.).  In the *Nabours* Complaint, Dr. Brown in part alleged that the Smyrna Police Department had investigated her medical practice, intimidated her patients, and told local pharmacies not to fill her prescriptions.  *Id.*  The earliest alleged act occurred on February 19, 2009, when a Smyrna police officer allegedly entered her clinic posing as a patient.  (*Id.* ¶ 22.)  According to the court's opinion granting summary judgment in that case, the evidence ultimately showed that Smyrna had begun investigating Dr. Brown's clinic in late 2008, and that the City and DEA investigations merged from November 2008 forward.  *See Brown v. Nabours*, No. 3:09-cv-0927, 2011 WL 2443882, at *6-*7, *18 (M.D. Tenn. June 15, 2011).  Indeed, in this case, Dr. Brown testified at her deposition that she began receiving reports from patients in or before February 2009 that local pharmacies had refused to fill her prescriptions.

[5]In most relevant part, the *Nabours* Complaint alleged  that, "[s]ometime on or before April 20, 2009, Defendants advised [a] CVS Pharmacy . . . that Dr. Brown was being investigated and that CVS should not fill prescriptions written by Dr. Brown," and that, "[f]rom April 2009 through July 2009, . . . the pharmacies located at Kroger's [], Rexall [], Rite Aid [], Wal-Mart [], and Reives-Saines [] refused to fill prescriptions written by Dr. Brown because law

2010, Dr. Brown also filed a separate lawsuit against DEA agent Michael Hale and unnamed "John Doe" officers, alleging that Hale and other DEA officers violated her state and federal rights during and after the August 6, 2009 raid. *See Brown v. Hale*, No. 3:10-0736, 2012 WL 1815625, at *1 (M.D. Tenn. May 17, 2012) ("*Hale*"); *see also Brown* Docket No. 1, Verified Complaint. In her Verified Complaint, Dr. Brown asserted, in most relevant part, that the "Defendants have contacted local pharmacies in and around Plaintiff's medical clinic and discouraged those pharmacies from filling the prescriptions of Plaintiff's patients." (*Brown* Verified Compl. ¶ 12.) She averred that, as a consequence, "[m]ultiple patients of Plaintiff have reported to her that local pharmacies have denied care to the patients and that the local pharmacies justified the denial of care on the basis that Plaintiff was being investigated by the DEA." (*Id.* ¶ 13.)[6]

Here, Dr. Brown contends that, between early 2009 and early 2012 – both during and after the investigation of her medical practice – pharmacies owned and/or operated by the defendants refused to fill prescriptions written by her. She contends that, in some instances, the

---

enforcement officials instructed those pharmacies not to fill her prescriptions." (*Nabours* Compl. ¶¶ 25 and 36.) Dr. Brown also alleged that law enforcement officials had monitored Dr. Brown and her clinic, confronted and intimidated her patients, and told her patients that she had engaged in illegal and criminal activity, thereby causing her to lose patients. (*Id.* at ¶¶ 23, 27-34, and 37-39.) On June 15, 2011, the district court granted summary judgment to the defendants. (*Nabours* Docket No. 64, Mem.) The Sixth Circuit affirmed, and the United States Supreme Court denied Dr. Brown's petition for a writ of certiorari.

[6]In *Hale*, this court granted the government's unopposed motion to stay the case pending the then-ongoing federal criminal investigation into Dr. Brown's medical practices (*see Brown* Docket Nos. 8-9 (motion and memorandum), 10 (Dr. Brown's consent to stay), and 11 (Order)). (*See also Brown* Docket Nos. 13 and 16 (granting further extensions)). After the stay was lifted – apparently without a representation from the federal government concerning the status of the investigation – the court granted summary judgment to the defendants on all claims. *Hale*, 2012 WL 1815625, at *8. The Sixth Circuit affirmed, and the Supreme Court denied Dr. Brown's petition for a writ of certiorari.

4

pharmacists told the patients that Dr. Brown was "under investigation" by the DEA or that, as a general matter, the pharmacy would not fill prescriptions written by her. Dr. Brown argues that, by refusing to fill prescriptions and by (at times) referencing the DEA investigation when doing so, the defendants are liable to her for intentional interference with business relations and invasion of privacy under Tennessee law.[7]

## II.   Evidence Concerning Denial of Filled Prescriptions

The record contains testimony from Dr. Brown and affidavits from several patients relating to the pharmacies' refusals to fill prescriptions. The defendants also appear to have relied on the Complaint allegations and/or to have assumed their veracity.

As explained herein, Dr. Brown herself publicized the Smyrna/DEA investigation when she filed the *Nabours* lawsuit on October 2, 2009. For purposes of Dr. Brown's claims, particularly her invasion of privacy claim, the distinction between statements made by pharmacists before she filed *Nabours* as opposed to statements made after she filed *Nabours* is potentially relevant to the court's analysis. Therefore, where possible, the court has attempted to identify and delineate the timing of prescription denials and the associated statements, if any, by the pharmacists concerning the grounds for refusing to fill particular prescriptions.

### A.   Brown Affidavit

According to Dr. Brown's affidavit, her patients informed her that the defendants' pharmacies had refused to fill prescriptions in the following instances:

_____

[7]Dr. Brown's Complaint also contained a separate count asserting that the defendants are liable under a theory of *respondeat superior*. Dr. Brown has not contested that this theory of liability is already incorporated into and subsumed by the intentional interference and invasion of privacy claims. Therefore, consistent with the parties' treatment of the issue in briefing the instant motions, the court will address only the intentional interference and invasion of privacy claims.

5

- CVS:  16 refusals, 9 of which were reported to her before she filed *Nabours*.

- Wal-Mart:  14 refusals, 11 reported before *Nabours*;

- Walgreens:  15 refusals, time period not specified.

- K-Mart:  1 refusal, time period not specified.

## B.  Patient Affidavits

Dr. Brown has filed supporting affidavits from her patients relating only to a handful of the reports referenced in her own affidavit.[8]  The patient affidavits, which the defendants have not rebutted, establish the following sequence of relevant events, set out by defendant:

- CVS: (1) *November 2009, CVS in Bellevue, Tennessee*: Pharmacist refuses to fill prescription, telling patient that Dr. Brown was "under investigation"; (2) *November 9, 2009, CVS in Nashville*: Pharmacist refuses to fill a prescription for cholesterol medication written by Dr. Brown, stating that the DEA had told CVS not to fill Dr. Brown's prescriptions;[9] and (3) *June 2012, CVS in Smyrna*: Pharmacist refuses to fill prescription, stating that CVS "did not fill [Dr. Brown's] prescriptions" because CVS "had a problem with her."

- Walgreens: (1) *October 2010, Walgreens at "Northfield and Memorial" (city not specified)*: pharmacist refuses to fill prescription, stating that Dr.

---

[8]These affidavits relate to each defendant, including three affidavits concerning CVS (Docket No. 52, Exs. 4 (Murphy Aff.), 5 (Daniel Aff.), and 6 (Willburn Aff.).), three affidavits concerning Walgreens (Docket No. 53, Exs. 5 (Blair Aff.), 6 (Cundiff Aff.), and 7 (Singer Aff.)), one affidavit concerning K-Mart (Docket No. 54, Ex. 5, Vallejo Aff.), and three affidavits concerning Wal-Mart (Vallejo Aff., and Docket No. 55, Exs. 5 (Case Aff.) and 6 (Smith Aff.).)

[9]In the Willburn Affidavit, filed in opposition to CVS's Motion for Summary Judgment, Scott Willburn, Sr. describes the November 9, 2009 incident at the Nashville CVS.  His affidavit also states that, at the "end of 2009," the "LaVergne Drug Store" refused to fill a prescription written by Dr. Brown on the grounds that the DEA had instructed the pharmacy not to fill any of Dr. Brown's prescriptions.  (Willburn Aff. ¶¶ 4-5.)  In the Daniel Affidavit, also filed in opposition to CVS's Motion for Summary Judgment, Wendell Daniel says that, at an unspecified point in 2010, the "LaVergne Drug Store" similarly refused to fill his prescription from Dr. Brown, stating that the pharmacy would no longer fill prescriptions from Dr. Brown.  (Daniel Aff. ¶¶ 4.)  Dr. Brown does not state that the LaVergne Drug Store was affiliated with CVS or any other defendant, nor has she presented evidence demonstrating any affiliation.

6

Brown was "under investigation by the DEA"; (2) *June 2012 Walgreens on "Murfreesboro Road" (locality not specified)*: pharmacist refuses to fill prescription, stating that it "would not fill Dr. Brown's prescriptions" and "could refuse to fill any prescription"; and (3) *June 2012, Walgreens in Nashville*: pharmacist refuses to fill prescription, stating that pharmacy would no longer accept patient's insurance. However, after contacting the insurer, the patient confirmed coverage.[10]

- K-Mart: *November 2, 2009, K-Mart in Madison, Tennessee*: pharmacist stated that, "you know we're not going to fill this scrip" because Dr. Brown was "under investigation by the DEA."

- Walmart: (1) *August 2009, Walmart in Smyrna*: pharmacist refuses to fill prescription, stating that Dr. Brown was "under investigation"; (2) *November 2, 2009, Walmart in Madison, Tennessee*: pharmacist refuses to fill prescription because Dr. Brown was "under investigation by the DEA," and "Walmart would not fill prescriptions for Dr. Brown's patients because they have had so many problems";(3) *February 2012 Sam's Club in Murfreesboro, Tennessee*: pharmacist refuses to fill prescription.

In sum, the affidavits establish that, post-*Nabours*: (1) CVS pharmacies refused to fill prescriptions on two occasions in November 2009 and one occasion in June 2012; (2) Walgreens pharmacies refused to fill prescriptions once in October 2010 and twice in June 2012; (3) a K-Mart pharmacy refused to fill a prescription once in November 2009; and (4) Walmart pharmacies refused to fill prescriptions once in August 2009, once in November 2009, and once in February 2012.

###    C.    Complaint Allegations

_____

[10]In the Singer Affidavit, filed in opposition to Walgreens' Motion for Summary Judgment, Paige Singer avers that, in February 2012, a pharmacist at a Kroger pharmacy in Nashville refused to fill Dr. Brown's prescription, stating that it "did not fill prescriptions for Dr. Brown." (Singer Aff. ¶ 3.) Similarly, in the Smith Affidavit, filed in opposition to Walmart's Motion for Summary Judgment, Ralph Smith avers that a Kroger pharmacy in Murfreesboro refused to fill Dr. Brown's prescription in January 2011, stating that Dr. Brown was "under investigation." (Smith Aff. ¶¶ 4-5.) Dr. Brown does not state that Kroger's pharmacies are affiliated with any of the defendants, nor has she presented evidence demonstrating any affiliation.

7

In their Memoranda supporting the Motions for Summary Judgment, the defendants at times appear to assume that the Complaint allegations concerning particular patients are true for purposes of the court's Rule 56 analysis. (*See, e.g.*, Docket No. 43, Ex. 1, Wal-Mart Mem., at p. 1. ("From March 2009 to November 2009, four Wal-Mart pharmacies refused to fill prescriptions for twelve of plaintiff's patients. [Compl.] ¶¶ 74-99. Nine of the twelve patients were not told why their prescriptions were not filled. *Id.* at ¶¶ 74-99."); Docket No. 47, CVS Mem., at p. 2 ("Plaintiff alleges that the various CVS pharmacies refused to fill prescriptions presented by sixteen of Dr. Brown's patients." [citing Compl. ¶¶ 10-40]); Docket No. 41, Ex. 1, Walgreens Mem., at p. 2 ("Dr. Brown alleges that, between August 27, 2009 and July 11, 2011, Walgreens refused to fill prescriptions of fourteen (14) of her patients.")). However, notwithstanding the assumption in its brief that the Complaint allegations were true, Walgreens stated in its Statement of Undisputed Material Facts ("Walgreens' SUMF") that Dr. Brown has no actual knowledge that Wal-Mart pharmacists refused her prescriptions and that her only evidence was hearsay testimony. (*See* Docket No. 55, Ex. 2.) In her Response to Walgreens' SUMF, Dr. Brown states that "the attached affidavits are not hearsay," referencing the Case Affidavit and the Smith Affidavit, which relate only to *two* of the 14 alleged patients relative to Walgreens. Walgreens did not file a Reply; thus, it has not contested Dr. Brown's "denial" of that particular fact. Furthermore, the defendants have not rebutted or objected to the statements in Dr. Brown's affidavit. Finally, no defendant other than Walgreens specifically challenged Dr. Brown's testimony as hearsay.

Under the particular circumstances presented, the court will assume that – with respect to the issue of the frequency, timing, and substance of the pharmacist prescription refusals – the

representations in Dr. Brown's affidavit, the Complaint allegations referenced and relied upon by the defendants, and the statements in the patient affidavits are true. In addition to the facts discussed above, the Complaint indicates that, in some instances, the pharmacists demanded a diagnosis before filling the prescription. Dr. Brown has not identified any evidence showing that, in those instances, she or her patients attempted to satisfy that demand by providing the underlying diagnosis.

## **SUMMARY JUDGMENT STANDARD**

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (2013). At the summary judgment stage, the moving party bears the initial burden of identifying those parts of the record that demonstrate the absence of any genuine issue of material fact. *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). However, if the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial, the moving party may meet its burden by showing that there is an absence of evidence to support the non-moving party's case. *Id.* (citing *Celotex*, 477 U.S. at 325). "When the moving party has carried this burden, 'its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).) The non-moving party also may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial. *Id.*

9

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Moldowan*, 578 F.3d at 374 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the nonmoving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita*, 475 U.S. at 587). But "[t]he mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient," *Moldowan*, 578 F.3d at 374 (quoting *Anderson*, 477 U.S. at 252), and the non-movant's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249. An issue of fact is "genuine" only if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Matsushita*, 475 U.S. at 587).

## ANALYSIS

I. **Intentional Interference with Business Relations Claim**

A. **Legal Standard**

In Tennessee, a plaintiff must show the following elements to establish a claim of intentional interference with business relationships:

(1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons;

(2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general;

(3) the defendant's intent to cause the breach or termination of the business relationship;

(4) the defendant's improper motive or improper means; and

(5) damages resulting from the tortious interference.

10

*Trau-Med of Am., Inc. v. Allstate Inc. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002). In adopting this

tort in *Trau-Med*, the Tennessee Supreme Court stated as follows:

> The theory of the tort of interference, it is said, is that the law draws a line beyond
> which no member of the community may go in intentionally intermeddling with
> the business affairs of others; that if acts of which complaint is made do not rest
> on some legitimate interest, or if there is sharp dealing or overreaching or other
> conduct below the behavior of fair men similarly situated, the ensuing loss should
> be redressed; and that the line of demarcation between permissible behavior and
> interference reflects the ethical standards of the community.

*Id.* at pp. 700-701 (quoting *City of Rock Falls v. Chicago Title & Trust Co.*, 300 N.E.2d 331, 333

(Ill. Ct. App. 1973)). The *Trau-Med* court offered a non-exhaustive list of the types of conduct

that would constitute "improper means": "means that are illegal or independently tortious, such

as violations of statutes, regulations, or recognized common-law rules; violence, threats, or

intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation,

duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary

relationship; and those methods that violate an established standard of a trade or profession, or

otherwise involve unethical conduct, such as sharp dealing, overreaching, or unfair competition."

*Id.* at 701 n.5. Furthermore, the court stated that a plaintiff must show that the defendant's

"predominant purpose was to injure the plaintiff." *Id.* (internal citations omitted).

"A showing of impropriety is essential in a case for intentional interference with business

relationships." *Patterson v. Methodist Healthcare-Memphis Hosps.*, No. W2008-02614-COA-

R3-CV, 2010 WL 363314, at *10 (Tenn. Ct. App. Feb. 2, 2010). Thus, Tennessee courts have

cautioned that "the tort of intentional interference with business relationships 'should not be

interpreted in such a way as to prohibit or undermine the ability to contract freely and engage in

competition.'" *Id.* (citing *Watson's Carpet & Floor Coverings, Inc. v. McCormick*, 247 S.W.3d

11

169 (Tenn. Ct. App. 2007)).

Here, the defendants collectively argue that Dr. Brown cannot satisfy any element of her intentional interference claim.

### B. Pharmacy Regulations

Pharmacy practice in Tennessee is governed by federal law, state law, and the Rules of the Tennessee Board of Pharmacy. Under DEA regulations, 21 C.F.R. § 1306.04(a), pharmacists must ensure that prescriptions for controlled substances are issued for a legitimate medical purpose. Although the prescribing physician has a responsibility to prescribe and dispense controlled substances properly, "a corresponding responsibility rests with the pharmacist who fills the prescription." *Id.* According to the Sixth Circuit:

> The regulation requires pharmacists to use common sense and professional judgment, which includes paying attention to the number of prescriptions issued, the number of dosage units prescribed, the duration and pattern of the alleged treatment, the number of doctors writing prescriptions and whether the drugs prescribed have a high rate of abuse. When pharmacists' suspicions are aroused as reasonable professionals, they must at least verify the prescription's propriety, and if not satisfied by the answer they must refuse to dispense.

*Med. Shoppe-Jonesborough v. Drug Enforcement Admin.*, 300 F. App'x 409, 412 (6th Cir. 2008). Similarly, the Rules of the Tennessee Board of Pharmacy state as follows: "A pharmacist shall, by utilizing education, skill, experience, and professional judgment, make every reasonable effort to prevent the abuse of drugs which the pharmacist dispenses." Tenn. Comp. R. & Regs. Ch. 1140-02-.01(10), TN ADC 1140-02-.01(10) (emphasis added); *see also* Tenn. Comp. R. & Regs. § 1140-03-.01(3)(a), TN ADC 1140-03-.01(3)(a) ("A pharmacist shall be responsible for a reasonable review of a patient's record prior to dispensing each medical or prescription order. The review shall include evaluating the medical and prescription order for: (1) over-utilization or

12

under-utilization . . . [and] (7) clinic abuse/misuse."); *see also Med. Shoppe-Jonesborough*, 300

F. App'x at 412 ("Tennessee law also places a responsibility on pharmacists to prevent improper

prescriptions from being filled") (citing Tenn. Comp. R. & Regs § 1140-3.01(3)(a)).

Pharmacists who fail these obligations can, among other things, lose their federally required

DEA certificate of registration to dispense controlled substances. *See* 21 U.S.C. § 824(a)(4)

(authorizing DEA to revoke a registration if it determines that the pharmacy "has committed

such acts as would render [its] registation inconsistent with the public interest.") For example, in

*Medicine Shoppe*, the Sixth Circuit upheld a DEA order revoking a pharmacy's certificate of

registration, where, *inter alia*, the pharmacy "fell asleep at the wheel in honoring prescriptions

no reasonable pharmacist would fill without further inquiry" and ignored factors that "should

have raised red flags" about the propriety of the prescriptions. 300 F. App'x at 413. By filling

the prescriptions, the pharmacy "not only violated its duties under federal (and state) law to

ensure that only proper prescriptions were filled but also put public health and safety at risk." *Id.*

at 413.

Here, the defendants argue that the pharmacists who refused to fill Dr. Brown's

prescriptions did so in the exercise of the professional judgment and discretion that the law

requires.

### C.    Application

Dr. Brown's intentional interference claim fails for multiple independent reasons.

#### 1.    Failure to Show Improper Means or Improper Motive

Dr. Brown argues that, although pharmacists are authorized to exercise professional

judgment and discretion in dispensing drugs, pharmacists are not entitled to act in bad faith. Dr.

13

Brown argues that the issue of bad faith should be submitted to the jury to decide. Assuming *arguendo* that pharmacists may not act in bad faith to interfere with a physician's business, Dr. Brown has still failed to produce evidence showing either "improper motive" or "improper means" to support an intentional interference claim premised on that theory of liability.

Dr. Brown speculated at her deposition that the defendants sought to injure her, by refusing to fill the prescriptions, but could not articulate any basis for that belief. (*See* Brown Dep. at 243:13: ("Q: Why [] do you think the pharmacies that you have sued in this case have declined to fill prescriptions? A: I don't know. Q: You don't have a belief or an opinion about why they have done that? A: No.") The record contains no discovery of the defendants or their employees, let alone discovery tending to show that the defendants acted with the "predominant purpose" of injuring the plaintiffs' business. Indeed, Dr. Brown admitted at deposition that she had no evidence that the defendants intended to injure her. (*See id.* at 245:8-10 ("Q: You don't have any evidence of anyone trying to injure you, right? A: I do not know of any evidence at this time."; 245:17-19 ("Q: [D]o you have any reason to believe that anybody from Kmart was trying to injure you? A: Not that I know of at this time."); 247:17-19 ("Q: Is there any specific person at Walgreens that you can identify that intended to injure you? A: Not that I know of at this time."). Dr. Brown admitted at deposition that she has no evidence that the pharmacies ever communicated with each other (*id.* at 177:14-16) and that she has no opinion as to why the pharmacies generally took the same position with respect to prescriptions issued by her (*id.* at 179:17-20.).[11]

---

[11]Furthermore, Dr. Brown has produced no evidence showing what the pharmacies or the pharmacists would have stood to gain from refusing to fill the prescriptions in the first place.

14

Dr. Brown argues that the fact that the pharmacists, in some instances, stated that she was being investigated by the DEA shows that the defendants were acting with an improper motive to "push a wedge between Dr. Brown and her patients." But that is not a reasonable inference that can be drawn from the record. First, the statements at issue concerning the investigation were true: her medical practice in fact *was* being investigated by the DEA (and Smyrna) in 2009.[12] Second, there is no evidence in the record that any pharmacist commented on the nature of the investigation, whether it was justified, whether the patient in question should continue seeing Dr. Brown (or not), and/or the quality of Dr. Brown's care. Indeed, none of the patients who submitted affidavits on Dr. Brown's behalf stated that they discontinued their relationship with Dr. Brown after certain pharmacies refused to fill their prescriptions, nor has Dr. Brown identified evidence showing that any of the other patients referenced in the Complaint declined to continue seeing her after certain pharmacies refused to fill their prescriptions. Third, in light of the various regulations governing the conduct of pharmacists, there was a reasonable relationship between a raid on Dr. Brown's clinic and the pharmacists' wariness of continuing to dispense controlled substances to her patients. Dr. Brown has not shown that the pharmacists' conduct was unethical, that it violated state and federal regulations, or that it violated general professional standards for pharmacists – indeed, those regulations explicitly direct pharmacists to exercise judgment and discretion in dispensing prescription drugs.

By the same token, Dr. Brown has not shown that truthfully stating to patients that she

---

[12] In *Hale*, Dr. Brown herself averred that the DEA in fact contacted local pharmacies and discouraged them from filling prescriptions she had issued. Also, in *Nabours*, Dr. Brown alleged that Smyrna police officers instructed local pharmacies to cease filling prescriptions written by her.

was under investigation by law enforcement authorities was an "improper means" of interfering with her business relationships. Although she claims that the pharmacies "misused" the fact of the investigation and "defamed her" by telling certain patients about it, she fails to explain why the statements constituted "misuse" and/or defamation.

Dr. Brown seems to suggest that the court should shift the burden to the defendants at this stage to show that the defendants' actions were in fact motivated by a legitimate purpose. However, the burden is on *Dr. Brown*, not the defendants, to produce evidence that there is a genuine dispute of material fact concerning the defendants' means or motive for refusing to fill the prescriptions. Dr. Brown has not met her burden.[13]

Finally, the court observes that Dr. Brown has not attempted to analogize her theory of liability to the circumstances presented in any previous case involving an intentional interference claim, let alone a case involving a pharmacist's refusal to fill a prescription.[14]

2.    Failure to Show Intent

For substantially the same reasons stated in the previous section, Dr. Brown has failed to produce evidence showing that any of the defendants had the requisite intent to "cause the breach or termination" of Dr. Brown's business relationships with her patients.

_____

[13]Dr. Brown's case against K-Mart is particularly weak. Dr. Brown has produced evidence that a K-Mart pharmacy refused to fill a prescription *once* in November 2009 – *after* Dr. Brown had placed the fact of her investigation at issue in the *Nabours* Complaint. She admits that she has no evidence of coordination between K-Mart and the other pharmacies. Thus, no reasonable factfinder could conclude from this single incident that K-Mart intended to harm Dr. Brown's business and/or that K-Mart acted with an improper purpose or through improper means.

[14]The court also notes that Dr. Brown's brief does not draw any relevant legal distinction between the statements that allegedly occurred during the investigation and statements that occurred after the investigation concluded.

16

3. Failure to Show that Business Relationships Ended or the Loss of
<u>Future Business Relationships</u>

A defendant faces potential liability for intentional interference with business relationships only when the interference causes a third person to discontinue a business relationship or to refrain from entering into a prospective business relationship. *See Watson's Carpet*, 247 S.W.3d at 175-176. As defined in *Trau-Med*, this requires Dr. Brown to show that (a) she lost an existing business relationship with "specific third parties" and/or (b) she lost prospective business relationships with an identifiable class of third parties. 71 S.W.3d at 701. Dr. Brown has not produced evidence creating a genuine dispute of fact on either count.

First, Dr. Brown has not produced evidence showing that any existing relationships with specific patients ended as a result of the actions of the defendants. Although Dr. Brown testified generally that "a variety of patients . . . have left the office due to incidents with pharmacy retailers" (Brown Dep. at 173:23-171:1), that testimony, standing alone, is insufficient to satisfy her obligation under *Trau-Med* to show that she lost business relationships with "*specific* third parties." Indeed, at deposition, she could not identify any specific patients that she lost as a result of the defendants' actions. (Brown Dep. at 174:4-12 ("All those patients that you say you lost, which one of those patients did you lose because of anything Walgreens may have done? A: At this time, I cannot specifically give you specific names for specific patients. Q: Is that the same with respect to all the defendants here? A: Yes.").)[15]

Dr. Brown has also failed to present evidence that the defendants' actions caused her to lose prospective relationships with an identifiable class of third persons. At deposition, she

---

[15]According to Dr. Brown, her patients ultimately were able to fill their prescriptions at other pharmacies. (Brown Dep. at 176:16-22.)

admitted that she did not know whether any prospective patient failed to see her because of the defendants' alleged actions. (Brown Dep. at 177:8-11 ("Q: Is there someone that would have come to see you that didn't but for the allegations in the Complaint? A: I don't know.")

In her affidavit, Dr. Brown does state that, "[s]ince the defendant's pharmacists began refusing to fill my patient's prescriptions, I have encountered significant difficulty developing relationships with new potential patients." (Brown Aff. ¶ 4.) Dr. Brown's statement is self-serving, conclusory, and devoid of necessary context. Perhaps most importantly, ¶ 4 of her affidavit fails to reference, let alone explain, any relationship between the defendants' conduct and her alleged "difficulty" developing relationships with new patients, beyond the fact that the "difficulty" occurred at an unspecified point sometime between early 2009 (presumably) and mid-2013. During this four-year time frame, Dr. Brown may have had "difficulty" for any number of reasons having nothing to do with the defendants, such as, for example, changes in the economy, changes in her prospective patients' needs, poor advertising, bad reviews by patients concerning her bedside manner that spread by word of mouth, etc. Dr. Brown's bare affidavit statement, standing alone, does not support the reasonable inference that the defendants' conduct caused her to lose prospective business relationships, as opposed to the innumerable other reasons why she might have encountered difficulty. Moreover, Dr. Brown does not explain what she means by "difficulty" in the first place: Has she been taking in fewer new patients than she expected? Have any prospective patients referenced the conduct of local pharmacies and/or the fact of the DEA investigation as a basis for refusing to avail themselves of her services? Has someone negatively reviewed her on a variety of internet sites based on the pharmacies' refusal to fill her prescriptions? In the context of this case, the court finds that Dr. Brown's affidavit

18

statement is insufficient to create a genuine dispute of material fact as to whether she lost prospective business relationships.

4.     Failure to Show Damages

Dr. Brown has not presented evidence showing that she suffered damages from the defendants' alleged actions. As discussed in the previous section, Dr. Brown has not shown that, as a result of the defendants' alleged actions, (a) a specific existing patient terminated the patient's relationship with her and/or (b) any prospective class of identifiable third persons failed to do business with her. At deposition, she was unable to state whether she had in fact lost a single dollar of income because of the defendants' alleged actions. (Brown Dep at 177:12-178:1.) In fact, Brown admits that, between 2008 and 2010, her gross income actually *tripled*. (*See* Brown Dep. 122:12-17 and 116:20-22.)

In sum, the court finds that summary judgment is warranted because Dr. Brown has failed to present evidence establishing a genuine dispute of material fact with respect to at least four of the five elements of her intentional interference claim.

**II.     Invasion of Privacy**

**A.     Elements of Publicity Given to Private Facts Claim**

Tennessee courts have recognized an invasion of privacy claim for "publicity given to private facts" as defined within the Restatement (Second) of Torts § 652D. *See Harris v. Horton*, 341 S.W.3d 264, 272 (Tenn. Ct. App. 2009), *overruled on other grounds by Rogers v. Louisville Land Co.*, 367 S.W.3d 196 (Tenn. 2012); *Major v. Charter Lakeside Hosp., Inc.*, No. M2009-0085-COA-R3-CV, 1990 WL 125538, at *4-*5 (Tenn. Ct. App. Aug. 31, 1990); *Cawood v. Booth*, No. E2007-02537-COA-R3-CV, 2008 WL 4998408, at *9 (Tenn. Ct. App. Nov. 25,

19

2008); *see also Garmley v. Opryland Hotel Nashville, LLC*, No. 3:07-0681, 2007 WL 4376078, at *2-*4 (M.D. Tenn. Dec. 13, 2007); *Int'l Union v. Garner*, 601 F. Supp. 187, 190 (M.D. Tenn. 1985). As defined in the Restatement:

> One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public.

Restatement (Second) of Torts § 652D (1977). "The cause of action recognizes the right of all persons to be free from publication of information, regardless of its truth, which is truly private and the dissemination of which would be harmful or embarrassing." *Int'l Union*, 601 F. Supp. at 190. Publicity means that "the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Cawood*, 2008 WL 4998408, at *9. Therefore, "it is not an invasion of the right of privacy . . . to communicate a fact concerning the Plaintiff's private life to a single person or even to a small group of persons." *Cawood*, 2008 WL 4998408, at *8-*9.

### B.    "Private" Matter

As an initial matter, on October 2, 2009, Dr. Brown herself made the fact of the investigation against her public by filing the *Nabours* Complaint, which (at least in part) asserted claims premised on the conduct of Smyrna police officers related to that investigation, including allegations regarding the pharmacies' refusal to fill prescriptions. Although Dr. Brown argues that the *Nabours* lawsuit was "primarily" about her arrest, the face of the *Nabours* Complaint alleges that Smyrna law enforcement officers improperly "harassed" her patients, monitored her clinic, and communicated with pharmacies as part of an investigation into her medical practice. Thus, she cannot maintain that the fact of the investigation was a "truly private" matter after

20

October 2, 2009, when she placed the fact of the investigation at issue in a federal civil rights lawsuit. *See Rodgers v. McCullough*, 296 F. Supp. 2d 895, 903 (W.D. Tenn. 2003) ("[A] plaintiff may waive a privacy interest by placing private matters at issue in a litigation proceeding.") (citing *Givens v. Mullikin ex rel. Estate of McElwaney*, 75 S.W.3d 383, 412 (Tenn. 2002)); *Harris*, 341 S.W.3d at 273 ("'[T]here is no liability when the defendant merely gives further publicity to information about the plaintiff that is already public' and [] 'there is no liability for giving further publicity to what the plaintiff himself *leaves open to the public eye*'" (emphasis added) (quoting Restatement (Second) of Torts § 652D cmt. b. (1977)).[16]

Moreover, even as to the statements that allegedly were made before October 2, 2009, Dr. Brown admitted that she does not know whether the fact of the investigation was *already public knowledge* at the time the disclosures were made. (Brown Dep. 174:25-175:1 ("Q: So then do you know whether it was public knowledge or not? A: I don't know.").) Therefore, Dr. Brown has failed to produce evidence showing that the fact of the investigation was a "private" matter for purposes of her invasion of privacy claim. Indeed, both Smyrna and the DEA – both of which are public entities – participated in an investigation of Dr. Brown's medical practice, and Dr. Brown has not shown that her relationship to these agencies remained "private" during the relevant time frame. To the contrary, she has alleged both in previous lawsuits (*i.e.*, in *Nabours* and *Hale*) and in this case that, beginning at least by February 2009, law enforcement authorities approached some of her patients about the matter, conducted a raid of her medical office with multiple DEA and Smyrna personnel present outside of her clinic (*i.e.*, not keeping

---

[16]Dr. Brown again made the fact of the investigation available to the "public at large" by filing the *Hale* Complaint on August 4, 2010.

the raid a secret), and contacted local pharmacies (including the defendants) about her prescription practices.  Indeed, she admits that she does not know who or what caused the fact that she was under investigation to "spread through the community *to* various pharmacies." (Brown Dep. at 244:19-245:4 (emphasis added).)  In sum, Dr. Brown has not shown that, for purposes of her invasion of privacy claim, the cat was not already "out of the bag" when the pharmacists made the statements at issue.

### C.    Publicity

Only those instances in which pharmacists disclosed information relating to the investigation are potentially relevant to Dr. Brown's invasion of privacy claim.  That is, where the record does not show that the pharmacist actually disclosed any information about the basis for the denial, no "private" matter arguably was "publicized."  Therefore, the court will limit its analysis to alleged statements that, in some form, disclosed information about Dr. Brown.

Even viewing the facts in the light most favorable to Dr. Brown, CVS pharmacists allegedly told Dr. Brown's patients about the fact of the investigation only three times – once in September 2009 (pre-*Nabours*) and twice in November 2009 (post-*Nabours*) – only *one* of which occurred before she filed *Nabours.*  The fact that a pharmacist stated to a single patient that Dr. Brown was under investigation before October 2009 is insufficient to establish "publicity." Even if the court were to consider the two additional post-*Nabours* statements, the court would reach the same conclusion.

A K-Mart pharmacist allegedly told one patient, post-*Nabours*, that Dr. Brown was under investigation.  First, the subject matter was no longer "private" because it occurred after *Nabours*, meaning that the invasion of privacy claim fails on that basis alone.  Second, even

22

considering this single incident, the court would find that disclosing the matter one time is insufficient to constitute "publicity."

Even viewing the facts in the light most favorable to Dr. Brown, Dr. Brown has identified only three occasions on which a Wal-Mart employee disclosed to a patient that she was under investigation by law enforcement authorities: once in August 2009, once in September 2009, and once in November 2009 (post-*Nabours*).  The court finds that disclosure by Wal-Mart pharmacists to patients on two occasions pre-*Nabours* in insufficient to constitute "publicity." Even considering the one post-*Nabours* statement, the court would reach the same conclusion.

Even viewing the facts in the light most favorable to Dr. Brown, Dr. Brown has identified only three instances in which a Walgreens pharmacist allegedly referenced the investigation: once in August 2009, once in March 2010, and once in July 2011.  The court finds that the single pre-*Nabours* disclosure was insufficient to establish "publicity."  Even considering the two pre-*Hale* incidents, the court finds that two instances of disclosures to particular patients are insufficient to establish publicity.  Finally, even considering the post-*Hale* statement, the court finds that three disclosures to particular patients are insufficient to establish "publicity."

### D.    Highly Offensive

Even if Dr. Brown could establish the requisite "publicity" of "private" matter relative to one or more defendants, there is insufficient evidence from which a reasonable factfinder could conclude that the statements are "highly offensive to a reasonable person."  *See Parr v. Middle Tenn. State Univ.*, No. M1999-01442-COA-R3-CV, 1999 WL 1086451, at *3 (Tenn. Ct. App. 1999) ("Plaintiff must show that the matter disclosed is both highly offensive to a reasonable person and not of legitimate concern to the public.")  To the extent that the pharmacists disclosed

23

any information about the investigation, Dr. Brown does not contest that the information was both accurate and truthful. Dr. Brown has not identified any caselaw indicating that disclosing the fact that an individual is the subject of an ongoing investigation could, without more, constitute a "highly offensive" comment. As discussed above, Dr. Brown has not adduced evidence showing, for example, that any of the pharmacists made inflammatory statements about the investigation, about the underlying merits of the investigation, or about Dr. Brown or her practice.

### E. Legitimate Public Concern

Finally, Dr. Brown has not adduced evidence creating a material issue of fact as to whether the matter at issue was "of legitimate concern to the public." Dr. Brown dispenses controlled substances that have serious physical effects (at least in the short term), that are potentially addictive, and/or that can be the subject of abuse or criminal diversion. Here, Dr. Brown does not dispute (1) that Smyrna and the DEA investigated her prescribing practices over a substantial period of time, and (2) that statements by the pharmacies that she was under investigation and/or that the DEA had told the pharmacies not to fill her prescriptions were in fact true. Under the circumstances, it is axiomatic that the fact that public authorities were investigating Dr. Brown's prescription practices for controlled substances was a legitimate subject of public interest. *See Med-Shoppe*, 300 F. App'x at 413 (affirming DEA revocation of pharmacy certificate of registration, where pharmacy's failure to follow requisite standards "not only violated its duties under federal (and state) law to ensure that only proper prescriptions were filled but also put public health and safety at risk.")

The court also observes that, consistent with the court's conclusion that pharmacists were

24

dealing with an issue of legitimate public concern, Tennessee in recent years has passed multiple laws regulating prescription practices, pain management clinics, and the prescription of opioids specifically.  In 2011, the Tennessee legislature passed legislation that (in part) regulated pain management clinics, effective for rulemaking purposes on May 30, 2011, and for all other purposes on January 1, 2012.  *See* 2011 Tenn. Laws Pub. Ch. 340 (S.B. 1258), TN LEGIS 340 (2011) (codified as Tenn. Code Ann. § 63-1-301 *et seq.*).  Among other things, the law's provisions require pain management clinics to "have a medical director who is a physician that practices in this state under an unrestricted and unencumbered license," to submit an application to the Tennessee Department of Health ("TDOH") for a certificate to operate the clinic, and to receive payment for services in a form other than cash (except for co-pay/coinsurance/deductible payments for services that otherwise will be reimbursed by an insurer).  Tenn. Code Ann. §§ 63-1-306 and 310.   The law also requires pain management clinics to make disclosures as to whether the clinicians have ever been denied a license to prescribe a controlled substance or have been the subject of professional discipline for prescription practices and authorizes the TDOH to deny a certificate or renewal of a certificate if any of those circumstances prevail.  *Id.* § 63-1-309.  With respect to practitioners who provide services at pain management clinics, the law also authorizes disciplinary action for any violation of its provisions.  *Id*. § 63-1-311.

Recently, the Tennessee legislature also enacted the Addison Sharp Prescription Drug Regulatory Act of 2013, Tenn. Pub. Ch. 430 (S.B. No. 676/H.B. No. 1264), TN LEGIS 430 (2013), which became effective for rulemaking purposes on May 16, 2013, and for all other purposes on October 1, 2013.  The Act imposes requirements on both the Commissioner of the TDOH and "all prescribers who hold a federal drug enforcement administration (DEA) license

25

and who prescribe controlled substances." *Id.*, Tenn. Code Ann. 63-1-401. Certain requirements specifically concern opioids. For example, the Act requires the Commissioner to "develop recommended treatment guidelines" for prescribing "opioids," among other types of drugs. Tenn. Code Ann. § 63-1-401(a) (as amended by the Act). Section 4 of the Act also supplements previous laws by requiring that "[n]o prescription for any opioids . . . may be dispensed in quantities greater than a thirty (30) day supply" and that the dispensing entity must submit the transaction to a controlled substances monitoring database. Tenn. Code Ann. § 53-11-308 (as amended by the Act).[17]

Although these laws were not in place when the Smyrna and DEA investigation(s) began in late 2008 or early 2009, they show that the Tennessee General Assembly views prescription practices by a pain management clinic, including prescriptions for opioids specifically, as a legitimate public concern worthy of legislative attention and stringent regulatory oversight.

In sum, for multiple independent reasons, Dr. Brown's invasion of privacy claim fails.

## **CONCLUSION**

For the reasons stated herein, the defendants' Motions for Summary Judgment will be granted and all of Dr. Brown's claims will be dismissed with prejudice.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

---

[17]The Act also amended certain provisions of the 2011 law.

26